# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAMZA RAMZAN, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    -v-<br><br>GDS HOLDINGS LIMITED, WILLIAM WEI HUANG, and DANIEL NEWMAN,<br><br>        Defendants | Civil Action No.: 1:19-cv-09154-LAK |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF <u>THEIR MOTION TO DISMISS THE AMENDED COMPLAINT</u>

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ....................................................................................................4

      A.       GDS's China Data Center Business................................................................4

      B.       GDS's Corporate Structure .........................................................................7

      C.       The Blue Orca Report and GDS's Response ............................................9

      D.       This Action..................................................................................................12

ARGUMENT ...........................................................................................................................14

I.      The Complaint Fails To Adequately Plead A False Statement............................15

      A.       Plaintiffs Fail To Allege Well Pleaded Facts Giving Rise To A Plausible
                    Inference That GDS Neither Occupied Nor Derived Revenue From The
                    GZ1 Data Center .......................................................................................15

      B.       Plaintiffs Fail to Allege Well-Pleaded Facts Showing that GDS's
                    Disclosures Concerning its Data Center Acquisitions Were False ..........20

II.      The Complaint Fails To Adequately Plead Scienter .........................................23

      A.       Scienter Is Not Adequately Pleaded As To Either Of The Individual
                    Defendants ..................................................................................................24

      B.       Scienter Is Not Adequately Pleaded Against GDS .................................28

      C.       Plaintiffs' Scienter Allegations Are Neither Cogent Nor Compelling .................28

III.      The Complaint Fails to Adequately Plead Loss Causation.................................30

CONCLUSION.........................................................................................................................34

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Amgen Inc. v. Conn. Ret. Plans*,
  568 U.S. 455 (2013) ............................................................................................ 14

*Arfa v. Mecox Lane Ltd.*,
  2012 WL 697155 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir.
  2012)........................................................................................................................ 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ............................................................................. 4, 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................... 14, 15

*Cent. States, Southeast & Sw. Areas Pension Fund v. Fed. Home Loan Mortg.
  Corp.*,
  543 Fed. App'x 72 (2d Cir. 2013) ....................................................................... 31

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010) .................................................................. 24

*Condra v. PXRE Grp., Ltd.*,
  357 Fed. App'x 393 (2d Cir. 2009) ...................................................................... 29

*Das v. Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018) .................................................................. 26

*Defer LP v. Raymond James Fin., Inc.*,
  654 F. Supp. 2d 204 (S.D.N.Y. 2009) .................................................................. 25

*ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ........................................................................... 23, 28

*Feasby v. Industri-Matematik Int'l Corp.*,
  2003 WL 22976327 (S.D.N.Y. Dec. 19, 2003) .................................................... 18

*Fila v. Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016)........................................................ 4, 15, 32

*Gagnon v. Alkermes PLC*,
  368 F. Supp. 3d 750 (S.D.N.Y. 2019) .................................................................. 26

*Glaser v. The9 Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ......................................................... 18, 19, 28

*Goplen v. 51Job, Inc.*,
    453 F. Supp. 2d 759 (S.D.N.Y. 2006) ............................................................... 25, 27

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015) .............................................................. 15, 22

*In re Apple REITs Litig.*,
    2013 WL 1386202 (E.D.N.Y. Apr. 3, 2013) ............................................................ 15

*In re China Valves Tech. Sec. Litig.*,
    2012 WL 4039852 (S.D.N.Y. Sept. 12, 2012) ........................................................ 21

*In re CRM Holdings, Ltd. Sec. Litig.*,
    2013 WL 787970 (S.D.N.Y. Mar. 4, 2013) ............................................................ 31

*In re Merck & Co., Inc. Securities Litigation*,
    432 F.3d 261 (3d Cir. 2005) ................................................................................ 31

*In re Omnicom Group, Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010) ................................................................... 30, 31, 33

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008) ................................................................... 19

*In re PXRE Grp., Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ................................................................... 29

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................... 29

*In re Tempur Sealy Int'l Sec. Litig.*,
    2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ........................................................ 24

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ........................................................ 31

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ......................................................................... 24, 25

*Katz v. China Century Dragon Media, Inc.*,
    2011 WL 6047093 (C.D. Cal. Nov. 30, 2011) ........................................................ 21

*Kocourek v. Shrader*,
    391 F. Supp. 3d 308 (S.D.N.Y. 2019) ................................................................... 15

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .................................................................. 14, 30

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015) ........................................................ 26

*Meyer v. Green*,
    710 F.3d 1189 (11th Cir. 2013) ........................................................... 31, 32

*N. Collier Fire Control and Rescue Dist. Firefighter Pension Plan and Plymouth
    Cnty. Ret. Ass'n v. MDC Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ............................................. 26

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...................................................................... 18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ........................................................... 14, 15, 25

*S. Cherry St., LLC v. Hennessee Grp.*,
    573 F.3d 98 (2d Cir. 2009) ........................................................................ 25

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019) ........................................................ 28

*Sfiraila v. Deutsche Bank Aktiengesellschaft*,
    729 Fed. App'x 55 (2d Cir. 2018) .............................................................. 24

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ...................................................................... 23

*Teachers' Retirement System of Louisiana v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ...................................................................... 31

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ...................................................................... 27

*Zheng v. Pingtan Marine Enter. Ltd.*,
    379 F. Supp. 3d 164 (E.D.N.Y. 2019) ........................................... 4, 25, 27, 32

*Zucco Partners, LLC v. Digimarc Corp*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................... 19

## Statutes

15 U.S.C. § 78u-4 .......................................................................................... 14

15 U.S.C. § 78u-4(b)(2)(A) ............................................................................ 23

Defendants[1] respectfully submit this memorandum of law, together with the declaration of Alan Turner and the exhibits thereto, in support of their motion to dismiss Plaintiffs' Amended Class Action Complaint ("Complaint" or "AC").[2]

## PRELIMINARY STATEMENT

Defendant GDS (NASDAQ: GDS) develops, acquires, and operates high performance data centers in China—facilities that house, power, cool and supply connectivity to tens of thousands of its customers' computer servers.  On July 31, 2018, Blue Orca Capital, an acknowledged short seller, issued a purported "research report" that accused GDS of perpetrating a massive fraud on its investors.  While GDS's stock initially fell following the release of the Blue Orca report, GDS and its executive team subsequently rebutted these allegations.  The Company has continued to grow and prosper, its financial statements remain unchallenged, and its stock currently trades at a price more than 38% and $13 per share **_higher_** than its level immediately prior to Blue Orca's attack.  Notwithstanding these undisputed facts, Plaintiffs attempt to piggyback on the Blue Orca report, repeating its allegations in a securities fraud complaint against GDS, William Huang (its CEO) and Daniel Newman (its CFO).

Following the Blue Orca playbook to the letter, Plaintiffs allege two categories of misstatements in GDS's filings with the Securities and Exchange Commission ("SEC").  _First_, Plaintiffs challenge GDS's statements about the ownership and utilization of one of its data centers in Guangzhou, China, the "GZ1" data center.  GDS reported in its 2017 Annual Report, filed on Form 20-F (the "20-F Report"), that it had acquired GZ1 in 2016, that 100% of its area in service was committed to customers, and that 90% was currently in use.  Plaintiffs allege that

---

[1] Defendants are GDS Holdings Limited ("GDS" or the "Company"), William Wei Huang, and Daniel Newman (with Mr. Huang, the "Individual Defendants," and, collectively with GDS, the "Defendants").

[2] Citations to the Complaint are "AC ¶".  Citations to the Turner Declaration exhibits are "Ex.".

these statements are false, that other companies operate out of the GZ1 data center, and that GDS "has no presence" there.  *Second*, Plaintiffs allege that when GDS reported the acquisition of three other data centers (GZ2, GZ3 and SZ5) in its SEC filings, it dramatically overstated the prices it paid for those acquisitions, so that unnamed "GDS insiders could siphon off the difference."  AC ¶ 73.  Plaintiffs' allegations fail and its Complaint should be dismissed, for three fundamental reasons.

Failure to allege a false or misleading statement.  Plaintiffs' repetition of Blue Orca's allegations concerning the GZ1 data center fails to plead a plausible false or misleading statement.  Plaintiffs first claim that certain end users of the GZ1 data center have no contractual relationship with GDS.  However, GDS disclosed this fact in its filings, explaining that it both contracts directly with end users and also contracts with intermediaries, who in turn contract with end users.  Plaintiffs next claim that GDS is not entitled to sublease any portion of the GZ1 data center to its customers.  This observation is irrelevant because GDS does not claim to sublease to its customers, but instead enters into service contracts with them (a fact that GDS also discloses in its SEC filings).  Finally, Plaintiffs' claim that GDS has no presence at the GZ1 data center and that certain end users lease space directly from the owner of the building is contradicted by the publicly-filed lease entitling GDS to full possession of the entire building.  Moreover, Plaintiffs cannot rely on the purported statements of a confidential witness to support this claim because their description of the role of the alleged confidential witness lacks any indicia of reliability and thus cannot form the basis for a valid claim.  For each of these reasons, Plaintiffs' GZ1 allegations fail to state a claim.  *See* Section 1.A.

Plaintiffs' allegations of purported discrepancies in the acquisition prices of three data centers fare no better.  As this Court is well aware, filings with China's State Administration for

Industry and Commerce ("SAIC") often differ in scope and required content from SEC filings. Such was the case here.  While GDS's *SEC* filings disclosed the *total* price GDS paid to acquire an entire "target group" of entities that previously owned and operated each data center, the Chinese *SAIC* filings on which Plaintiffs rely reflect only the price GDS paid to acquire the *single China-based entity* in each target group that owned the necessary China data center operating license.  The differences between these disclosures do not suggest any misstatement in GDS's SEC filings.  Accordingly, these allegations fail to plead a false statement and this claim should be dismissed.  *See* Section I.B.

        <u>Failure to plead facts giving rise to a strong inference of scienter</u>.  The Complaint also fails to plead particularized facts giving rise to a strong inference of scienter.  Plaintiffs fail to offer any well-pleaded allegations of motive and opportunity, such as unusual stock sales. Instead, Plaintiffs rely on boilerplate scienter allegations that courts in this Circuit consistently find inadequate at the pleading stage.  Specifically, Plaintiffs claim that the Individual Defendants (i) signed Sarbanes-Oxley (SOX) certificates attesting to the truth of the statements in GDS's SEC filings, (ii) occupied high-level positions within GDS, and, (iii) publicly denied Blue Orca's fraud allegations.  Those allegations (viewed holistically) lack any meaningful factual content, fail to create an inference that either of the Individual Defendants made a false statement knowingly or with deliberate recklessness, and are thus deficient on their face. Because Plaintiffs have failed to plead facts giving rise to a strong inference of scienter with respect to either of the Individual Defendants or any other senior GDS executive, they cannot establish scienter as to GDS itself.  Accordingly, the Complaint should be dismissed for the separate and independent reason that Plaintiffs have failed to meet the scienter pleading requirements as to any Defendant.  *See* Section II.

<u>Failure to plead facts that could give rise to loss causation</u>.  The Complaint also fails to plead loss causation as a matter of law.  The loss alleged by Plaintiffs is the decline in GDS's share price following publication of the Blue Orca report on July 31, 2018.  But the Blue Orca report clearly and explicitly states that it is only providing Blue Orca's *opinions,* that those opinions are based entirely on "research and analysis *based on public information* in a manner that any person could have done if they had been interested in doing so," and that readers could "*publicly access any piece of evidence*" cited therein.  Second Circuit law clearly holds that where the cause of the claimed loss is a report or news article that opines on, or characterizes, publicly available facts, loss causation is lacking and the securities fraud claim must be dismissed.  *See* Section III.

This case is the latest in a series of deficient claims filed by Plaintiffs' counsel based on short seller reports.  *See Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164 (E.D.N.Y. 2019); *see also Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489 (S.D.N.Y. 2016).  Just as those prior suits were dismissed, this Court should—for the three reasons set forth above— likewise find the Complaint here inadequate and dismiss this action with prejudice.

## FACTUAL BACKGROUND[3]

### A.     GDS's China Data Center Business

GDS is incorporated in the Cayman Islands and headquartered in China.  AC ¶ 23.  The Company develops, acquires and operates high performance data centers in China's major

---

[3] These facts are taken from the Complaint, the well-pleaded factual allegations of which this Court must accept as true, as well as documents referenced in the Complaint, including certain SEC filings of GDS, which this Court may consider on this motion.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (courts adjudicating Rule 12(b)(6) motions to dismiss may consider documents attached to the complaint, "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit.").

economic hubs, including in Guangzhou and Shenzhen.  *Id.* ¶ 31, 34; Ex. 1 (Am. F-1 Reg. Stmt.)

at 1.  According to its 20-F Report:

> Our core business operations entail the planning and sourcing of new data center
> sites, developing such sites, securing customer commitments, providing our
> colocation services and managed services to customers, and maintaining high levels
> of service and customer satisfaction to develop and maintain long-term
> relationships with our customers. We focus on developing and operating what we
> refer to as high-performance data centers. These are data centers that feature large
> net floor area, high power capacity, density, and efficiency, and multiple
> redundancy across all critical systems.

Ex. 3 (20-F) at 57.

GDS's data centers provide business customers with the physical space, infrastructure,

security, power supply, cooling, fire suppression systems, and services necessary to house and

operate their computer servers and other business-critical IT (information technology)

equipment.  AC ¶¶ 4, 31; Ex. 3 (20-F) at 59.  GDS has been providing data center services since

2001, *see* Ex. 1 (Am. F-1 Reg. Stmt.) at 4, 130, and disclosed in its 2017 20-F Report that, as of

December 31, 2017, it operated sixteen self-developed data centers, representing approximately

90,000 square meters of net floor area in service.  Ex. 3 (20-F) at 57, 59, 60.  In 2016, GDS was

recognized by independent research firm 451 Research as the largest provider of high-

performance "carrier-neutral" (*i.e.* not tied to a sole telecommunications carrier) data centers in

China.  Ex. 1 (Am. F-1 Reg. Stmt.) at 1, 123.

As alleged in the Complaint and described in its 20-F Report, GDS provides data center

customers with two categories of services: (i) "colocation services" and (ii) "managed services."

AC ¶ 31.  "Colocation services" consist of providing physical space for the customer's computer

equipment, in addition to the power and cooling systems necessary to run the equipment.  *Id.* ¶¶

4, 23, 31; *see also* Ex. 3 (20-F) at 58, 63, 67.  The physical space for housing the customer's

computer equipment consists of dedicated modules within the data center and is measured in

terms of net floor area.  *Id*. at 1, 58, 60.  "Managed services" includes "a broad range of value-added services, covering each layer of the data center IT value chain," such as disaster recovery services, data storage services, and system security services (*e.g.*, intrusion protection, firewall management, and access control).  *Id*. at 63; *see also* AC ¶ 31.  From 2015-2017, more than 70% of GDS's revenue came from colocation services.  AC ¶ 31; Ex. 3 (20-F) at 85.

The property where each data center is located is either owned or leased by GDS.  Ex. 3 (20-F) at 57, 87.[4]  Once a facility has been developed, equipped, fitted out and commissioned for use as a data center, it is operated by GDS to provide services to its customers.  Ex. 3 (20-F) at 64.  A GDS data center customer does not enter into a lease or sublease for any part of the property where a data center is located.  Instead, it enters into a colocation and/or managed services contract.  *Id*. at 11, 58, 63 (discussing use of colocation services contracts); 63, 88 (discussing managed services); F-49 ("[t]he Company did not sublease any of its operating leases for the period presented.").  Pursuant to such contracts, customers are entitled to house and operate their computer equipment within dedicated modules, while GDS is responsible for operating the facility in accordance with numerous service level parameters.  *Id*. at 56, 58, 63, 64, 65.  GDS disclosed in its 20-F Report that it does not have direct contracts with all end user customers, and instead may contract with intermediate contracting parties, who then, in turn, contract with end user customers:

> We consider our customers to be the end users of our data center services. We may enter into contracts directly with our end user customers *or through intermediate contracting parties*. We have long-standing relationships with all the major PRC telecommunications carriers who are both partners providing network services to our customers as well as intermediate contracting parties for the sale of colocation services to our customers. Because we negotiate with, maintain and support each

---

[4] For example, GDS leases the property housing the GZ1 data center.  *See* Ex. 3 (20-F) at 60.  GDS's lease for the GZ1 data center property is attached as Exhibit 10.23 to its Registration Statement, filed on Form F-1 with the SEC on October 4, 2016.  *See* Ex. 2 (lease agreement).

of the end users of our services, even where the actual data center contract is made with the telecommunications carrier, we consider the end user to be our end customer.

*Id*. at 65 (emphasis added).  The Company's customer base is described as follows:

We currently serve approximately 500 customers, including cloud service providers and large Internet companies, a diverse community of PRC and foreign financial institutions as well as telecommunications and IT service providers and large domestic private sector and multinational corporations, many of which are leaders in their respective industry verticals. We host a number of the largest cloud service providers operating in China, including Aliyun, the cloud computing unit of Alibaba, which are present in several of our data centers.

*Id*.; AC ¶ 23.

GDS also disclosed in its 20-F Report certain metrics relating to its data centers, including "area in service," "commitment rate," and "utilization rate."  Ex. 3 (20-F) at 1.  "Area in service" is the net floor area of data center space "in service for which one or more modules has been equipped and fitted out ready for utilization by customers."  *Id*.  "Commitment rate" is the ratio of "area committed" (*i.e.* "net floor area of data centers in service for which agreements from customers remain in effect"), to area in service.  *Id*.  And "utilization rate" is the ratio of "area utilized" (*i.e.* "net floor area of data centers in service that is also revenue generating pursuant to customer agreements in effect") to area in service.  *Id*.  As GDS explained in its 20-F Report, "[t]he difference between commitment rate and utilization rate is primarily attributable to customers who have entered into agreements but have not yet started to use revenue generating services."  *Id*. at 57.

## B.    GDS's Corporate Structure

Operating a data center in China requires an "internet data center" ("IDC") license.  AC ¶ 82.  Chinese law restricts foreign companies from obtaining IDC licenses or owning Chinese companies that operate data centers.  *Id*.  However, there is no restriction on foreign companies owning the data center property and other assets.  *Id*.  In addition, foreign exchange regulations

control the movement of capital between offshore foreign investors and direct foreign-invested companies located in China. *Id*. ¶¶ 32 n.5, 81.

As a Cayman Islands-incorporated entity (*i.e.*, a foreign entity from the perspective of the Chinese government), GDS is subject to these restrictions. *Id*. ¶¶ 32, 82. To comply with Chinese law, GDS enters into contractual arrangements with Chinese companies known as "variable interest entities" ("VIEs") that possess licenses to provide data center services. *Id*. In those instances where the VIE owning the IDC license does not also own all other relevant data center assets, GDS employs the following two-step process to acquire a data center:

1) A China-based VIE having a contractual relationship with GDS acquires the Chinese entity holding the IDC license and any other relevant assets (the target entity referred to as the "License Co."); and

2) A Hong Kong-incorporated GDS subsidiary acquires the Hong Kong holding company that holds the entity that possesses all remaining data center assets (the target entity referred to as the "Asset Co.").

*Id*. ¶¶ 82-83. Upon completion of the transaction, GDS's Hong Kong subsidiary indirectly owns the Asset Co., the China-based VIE owns the License Co., and GDS, through a contractual arrangement, controls the License Co., which provides colocation and managed services to GDS's customers. *Id*. ¶¶ 32 n.5; 82-83. This structure is common in China, and permits foreign investment in restricted Chinese industries in compliance with applicable regulations. *Id.* ¶ 32 n.5.

As relevant here, the China-based part of the data center transaction—step (1) above—must be reported to the SAIC, the Chinese regulatory body with which Chinese companies register, file annual financial reports, and report shareholder changes (including those related to the sale of Chinese companies). *Id*. ¶¶ 65-66. However, any non-China portions of the transaction, including step (2) above, where the company holding the Asset Co. is a Hong Kong

entity, do *not* need to be reported to the SAIC. *Id.* GDS acquired GZ2, GZ3, and SZ5 (the three data centers that are the subject of Plaintiffs' second fraud claim) using this transaction structure. Ex. 2 to AC (describing transaction structure). Accordingly, in its *SEC* filings, GDS disclosed the overall acquisition price for the entire "target group" of companies associated with each such acquisition. Ex. 3 (20-F) at 2, 54, 103; Ex. 5 (6-K) at 1. By contrast, the *SAIC* filings on which Plaintiffs rely—made by the China-based entities holding the IDC licenses that were acquired as part of the transaction—each disclosed the acquisition price paid solely for that entity, and not for the group as a whole. These are the reported purchase amounts:[5]

| Data center | **SEC** disclosure of price paid for entire target group | **SAIC** disclosure of price paid to acquire China-based company |
|:---:|:---:|:---:|
| GZ2 | RMB 234 million | RMB 72 million |
| GZ3 | RMB 262 million | RMB 40 million |
| SZ5 | RMB 312 million | RMB 0.5 million |

AC ¶¶ 58, 60, 62, 67-72. These differences form the basis for Plaintiffs' mistaken allegations of "discrepancies" with respect to the reported acquisition prices of GZ2, GZ3 and SZ5.

### C.   The Blue Orca Report and GDS's Response

On July 31, 2018, Blue Orca Capital, an acknowledged short seller, published a "research report" (the "Blue Orca Report") claiming fraud at GDS. Ex. 6.[6] Blue Orca asserted, among other things, that: (1) GDS did not operate or derive any revenue from the GZ1 data center; and (2) GDS overstated in its SEC filings the prices it paid to acquire the GZ2, GZ3, and SZ5 data

---

[5] As a company that operates exclusively in China, GDS records its accounts and finances in Renminbi or "RMB", the legal currency of China. 1 RMB currently equals around US$0.15. Ex. 3 (20-F) at 5-6, 43.

[6] Blue Orca issued a second report on August 9, 2018, post-dating the proposed class period. AC ¶ 86(b) n.16.

centers.  *Id*.  That day, GDS's NASDAQ-traded ADS fell from $34.75 to $21.83 per share.  AC ¶ 16.  As of the date of this filing, December 6, 2019, GDS's shares trade at $48 per share, 38% *higher* than GDS's trading price immediately prior to issuance of the Blue Orca Report.[7]

With respect to the GZ1 data center, the Blue Orca Report stated that its research was based entirely on publicly available materials, including investor presentations of GDS and other companies, blueprints of the "G6" building at the South China Innovations Park where the GZ1 data center is located, information on the websites of GDS and third parties, and marketing brochures.  Ex. 6 at 7, 9, 10, 15, 20, 53.  Based on this information, Blue Orca opined that the occupants of the GZ1 data center do not have direct relationships or "leases" with GDS, that therefore GDS must not operate the data center at all, and that statements in GDS's annual report on Form 20-F about commitment and utilization rates at the GZ1 data center must be false.  *Id*. at 6-17.  As to the GZ2, GZ3, and SZ5 data centers, the Blue Orca Report identifies alleged discrepancies between, on the one hand, the purchase price to acquire each group of entities that previously owned each data center, as disclosed by GDS in its _SEC_ filings, and, on the other hand, the purchase price to acquire each China-based entity (but not the entire group of entities owning a given data center) disclosed in the _SAIC_ filings made by those individual entities.  *Id*. at 24-32, 37-38.

The Blue Orca Report prominently states on page one that it is a short-biased opinion piece that "EXPRESSES SOLELY [BLUE ORCA'S] OPINIONS."  *Id*. at 1.  It also says that Blue Orca, as a "biased" short seller, "[o]bviously [ ] will make money if the price of GDS stock declines"; that the "report and all statements contained herein … are not statements of fact;" that

---

[7] GDS's ADS historical daily share price is publicly available at https://www.nasdaq.com/market-activity/stocks/gds/historical.

Blue Orca "conducted research and analysis based on public information in a manner that any person could have done if they had been interested in doing so"; and that any reader could "publicly access any piece of evidence cited in [the Report] or that [Blue Orca] relied on to write [the Report]." *Id*. at 1, 53.  The Report contains links to the publicly available material it relies upon, and repeatedly notes the public nature of its claimed source material.[8]

On August 1, 2018, GDS issued a press release denying Blue Orca's allegations.  Ex. 7. Subsequently, on its August 14, 2018 earnings call, GDS's CEO, Mr. Huang, and CFO, Mr. Newman, further explained why the Blue Orca Report's allegations were incorrect.  Ex. 8. Specifically, the press release explained that GDS had colocation services contracts with two customers that had committed to use the entire GZ1 data center, and that those two customers, in turn, had contracts with the end users whose equipment was housed in the data center, all of which was consistent with GDS's 20-F disclosures.  Ex. 7 (press release) at 1.  The press release further stated that GDS was, in fact, receiving revenue from those two customers for 94% of the total committed space at the data center, consistent with GDS's disclosures as to "area utilized" and "utilization rate."  *Id*.  On the earnings call, Mr. Newman also reiterated that GDS did not "lease" data center space to its customers.  Ex. 8 (Q2 2018 Earnings Call Tr.) at 4.

With regard to Blue Orca's allegations about GDS's acquisitions of the GZ2, GZ3, and SZ5 data centers, Mr. Newman reiterated on the earnings call that, as disclosed in its 20-F Report, GDS had acquired a target group of entities associated with each data center, in compliance with Chinese regulations.  He also explained why such transaction structures were necessary pursuant to relevant Chinese regulations.  *Id*. at 7-8.  Messrs. Huang and Newman also addressed other Blue Orca allegations, including that GDS had an allegedly large amount of

---

[8] *See, e.g., id*. at 3, 4, 6, 7, 8, 9, 10, 14, 18, 24, 25, 26, 27, 29, 38, 48, 50, 51.

unbilled receivables, and that it kept an allegedly unusually large amount of cash outside of China.  *Id*. at 5-6.

### D.     This Action

On August 2, 2018, plaintiff Hamza Ramzan filed this putative class action in the Eastern District of Texas on behalf of himself and other purchasers of GDS's ADS between March 29, 2018 and July 31, 2018.  *See* Civ. A. No. 18-cv-00539 (E.D. Tex.), Dkt. No. 1.  On October 26, 2018, the court appointed Yuanli He as Lead Plaintiff, who filed the operative Complaint on December 24, 2018 with himself and Michael Zollo as named plaintiffs.  *Id.*, Dkt. Nos. 20-21. The Complaint essentially regurgitates the allegations of the Blue Orca Report:

Alleged "Fraud 1":  The Complaint alleges that GDS's disclosures regarding the GZ1 data center were false.  AC ¶¶ 34-57.  Specifically, Plaintiffs allege that the table in the 20-F Report listing GZ1's "area in service" as 6,521 square meters, its "commitment rate" as 100%, and its "utilization rate" as 90% were all false.  Ex. 3 (20-F) at 60; AC ¶ 38.  Plaintiffs further allege that Defendants' statement on an earnings call for the first quarter of 2018 that GZ1's utilization rate had increased to 93.7% was also false.  AC ¶ 44.  Indeed, Plaintiffs allege that in fact GDS "had no presence" in, and "was not earning any revenue" from GZ1.  *Id.* ¶ 43.

Alleged "Fraud 2":  The Complaint also alleges that GDS inflated the acquisition prices of the GZ2, GZ3, and SZ5 data centers.  *Id.* ¶¶ 58-77.  Specifically, Plaintiffs allege that the following disclosures were false:

| Data center | GDS's SEC disclosures | Plaintiffs' allegations |
|---|---|---|
| SZ5 | "On June 29, 2017, we consummated an acquisition of all the equity interests in a target group from a third party for an aggregate contingent purchase price of RMB 312.0 million (US $48.0 million). The target group owns a data center project ("SZ5") in Shenzhen, | Plaintiffs allege the "true price" was only RMB 0.5 million (approx. US |

| | | | |
|---|---|---|---|
| | | China." Ex. 3 (20-F) at 2; AC ¶¶ 58-59. | $33,000). AC ¶¶ 67, 72. |
| | GZ2 | "On October 9, 2017, we consummated an acquisition of all equity interests in a target group from a third party for a cash consideration of RMB 234.0 million (US $36.0 million). The target group owns a data center project ("GZ2") in Guangzhou, China." Ex. 3 (20-F) at 2; AC ¶¶ 60-61. | Plaintiffs allege the "true price" was only RMB 72 million (approx. US$4.8 million). AC ¶¶ 68, 72. |
| | GZ3 | "In May 2018, the Company consummated an acquisition of all equity interests in a target group from a third party for an aggregate purchase price of RMB 262,244,000 (including contingent considerations of RMB 245,244,000). The target group owns a data center in Guangzhou, China (Guangzhou 3)." Ex. 5 (1Q18 6-K) at F-25; AC ¶¶ 62-63. | Plaintiffs allege the "true price" was only RMB 40 million (approx. US $2.67 million). AC ¶¶ 69-72. |

Plaintiffs allege other facts (also taken from the Blue Orca Report) that they claim support their fraud allegations, including that GDS (i) has been "a serial raiser of capital since 2015," *id.* ¶ 74; (ii) keeps significant cash outside China, *id.* ¶ 77; and (iii) has higher unbilled accounts receivable than Plaintiffs believe it should, *id*. ¶ 93. Plaintiffs do not assert specific misrepresentation claims based on their allegations, nor do they allege that GDS's reported financial results are false or misleading. The Complaint asserts claims under Section 10(b) of the Securities Exchange Act (the "Exchange Act") and SEC Rule 10b-5 against all Defendants, *id.* ¶ 114; and under Exchange Act Section 20(a) against Messrs. Huang and Newman, as alleged control persons of GDS, *id*. ¶ 119.

On February 22, 2019, Defendants moved to dismiss the Complaint for improper venue, lack of personal jurisdiction, and failure to state a claim, and in the alternative to transfer the case to this District as a more convenient forum. *See* Civ. A. No. 18-cv-00539 (E.D. Tex.), Dkt. No. 24. Plaintiffs opposed. On September 30, 2019, Magistrate Judge Kimberly Priest Johnson of the U.S. District Court for the Eastern District of Texas granted Defendants' motion to dismiss

for lack of personal jurisdiction, and transferred the case to this Court.  *Id.*, Dkt. No. 44.  The

Texas court did not rule on Defendants' motion to dismiss for failure to state a claim.  *Id.*

## <u>ARGUMENT</u>

Dismissal of this case is warranted because the Complaint does not state a claim for

securities fraud under SEC Rule 10b-5.  To plead such a claim, a plaintiff must allege:

> (1) a material misrepresentation or omission by the defendant; (2) scienter;
> (3) a connection between the misrepresentation or omission and the
> purchase or sale of a security; (4) reliance upon the misrepresentation or
> omission; (5) economic loss; and (6) loss causation.

*Amgen Inc. v. Conn. Ret. Plans*, 568 U.S. 455, 460-61 (2013).  To survive a motion to dismiss a

Rule 10b-5 claim, Plaintiffs must satisfy the heightened pleading requirements of Fed. R. Civ. P.

9(b).  The complaint must "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent."  *ATSI*, 493 F.3d at 99.  Furthermore, pursuant to the PSLRA,

Plaintiffs must plead each alleged misstatement with particularity and "with respect to each act

or omission ... state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind."  *Id.*; *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir.

2004); 15 U.S.C. § 78u-4.  To establish loss causation, Plaintiffs must allege "that the

misstatement or omission concealed something from the market that, when disclosed, negatively

affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir.

2005).

While a court must accept well-pleaded factual allegations as true, it should not credit

conclusory or unduly speculative allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009);

s*ee also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("labels and conclusions," and

"formulaic recitation[s] of the elements of a cause of action will not do").  A plaintiff must allege

facts sufficient to establish a right to relief "above the speculative level." *Twombly*, 550 U.S. at 555-56.  Courts in this Circuit regularly dismiss securities litigation complaints for failing to make plausible or non-contradictory allegations.  *See, e.g., Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171-72 (S.D.N.Y. 2015) (dismissing Section 10(b) claims for accounting fraud for failure to "plausibly allege a misstatement" based on failure to plead specific facts demonstrating violation of relevant accounting rules) (citing cases); *Kocourek v. Shrader*, 391 F. Supp. 3d 308, 323-35 (S.D.N.Y. 2019) (dismissing Section 10(b) claims where plaintiffs failed to plausibly allege a misstatement, finding, among other things, that the deposition testimony on which plaintiffs relied did not contradict the statement plaintiffs alleged was misleading).

Here, the Complaint fails to state a claim for at least three reasons.  *First*, Plaintiffs fail to plausibly allege that any of the Defendants' statements were false or misleading.  *Second*, the Complaint does not raise a strong inference of scienter on the part of any Defendant.  *Third*, loss causation is lacking because the stock drop allegedly resulted from the publication of an opinion that was based on information that was already publicly available.

## I.    The Complaint Fails To Adequately Plead A False Statement

### A.    Plaintiffs Fail To Allege Well Pleaded Facts Giving Rise To A Plausible Inference That GDS Neither Occupied Nor Derived Revenue From The GZ1 Data Center

In order to plead falsity, "Plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.  Furthermore, "the Court does not view these statements in isolation, but rather alongside Defendants' other representations, taken together in context." *Fila*, 195 F. Supp. 3d at 495.  "Defendants cannot be alleged to have misrepresented or omitted that which they plainly disclose." *See In re Apple REITs Litig.*, 2013 WL 1386202, at *12 (E.D.N.Y. Apr. 3, 2013). Plaintiffs fail to meet this burden.

Plaintiffs' first alleged "fraud" concerns the GZ1 data center located in Guangzhou.  GDS acquired the data center in 2016 and disclosed in its 20-F Report a 100% "commitment rate" and 90% "utilization rate" for that data center, meaning that 100% of the area in service was committed to customers, and 90% of it was already generating revenue.  AC ¶¶ 34, 38-41.  Plaintiffs claim that the entire acquisition of this data center is a hoax, that GDS does not operate it or derive revenue from it at all, and that therefore GDS's claimed commitment and utilization rates are "completely false."  *Id*. ¶¶ 34–57.

Plaintiffs' contention that GDS completely fabricated its acquisition and operation of a six-and-a-half thousand square meter data center, and lied in its SEC filings about leasing the building housing the data center and entering into contracts with customers and earning revenue from the data center, is as implausible as it is false.  To plausibly allege such an audacious scheme would require a solid factual basis.  By contrast, Plaintiffs' allegations rest on three tissue-thin factual allegations that do not support its claim of an outright, blatant fraud.

Plaintiffs' Claim That GDS's Competitors Operate Out Of GZ1

Plaintiffs first assert that 100% of the GZ1 data center cannot be committed to GDS customers, as GDS claims, because other companies that they and Blue Orca describe, without elaboration or support, as GDS's "competitors," were providing data hosting services out of the GZ1 data center.  AC ¶¶ 47-52.  This allegation is entirely consistent with GDS's prior disclosures.  GDS clearly stated in its SEC disclosures that it entered into contracts both with end user customers and with "intermediate contracting parties."  Ex. 3 (20-F) at 65.  The Company also disclosed that some of the parties with which it contracted were "telecommunications and IT service providers."  *Id*.; AC ¶ 23.  GDS further explained that the commitment and utilization rates that it discloses are based on GDS's contracts with both end users and intermediaries.  Thus, the allegation that other IT service providers (whom Plaintiffs characterize as competitors)

may be providing colocation services to end user customers from the GZ1 premises is entirely consistent with GDS's prior disclosures and fails to allege a false or misleading statement.

Plaintiffs' Claim That Subleasing Of The GZ1 Data Center Is Not Permitted

Plaintiffs next claim that its investigator was informed by a representative of the South China Innovations Park (which allegedly owns the office park where the GZ1 data center and other properties are located) that it "does not permit tenants to sublease or assign a lease to third parties." AC ¶ 53(a).  Once again, this allegation is entirely consistent with GDS's SEC disclosures.  Indeed, the Complaint itself explicitly notes that the copy of the GZ1 lease that is attached to GDS's SEC filings states that the GDS subsidiary holding the lease (Guangzhou Weiteng Construction Co., Ltd.) may not sublease the property without the landlord's consent. *Id*. ¶ 85(b).  Thus, the information in question was already publicly disclosed by GDS. Moreover, GDS explained to investors that it enters into colocation service contracts with its intermediaries and customers, rather than subleasing property to them.  *See supra* at 6-7.  Indeed, GDS expressly told investors that it did not sublease any of its data center properties.  Ex. 3 (20-F) at F-49.  Accordingly, this allegation is fully consistent with GDS's disclosures and fails to allege a false or misleading statement.

Plaintiffs' Claim That Certain GZ1 End Users Lease Directly From South China Innovations Park

Finally, Plaintiffs allege that their investigator was informed by a representative of Guangdong Zhonghe, a technology company, that it occupied half a floor in the GZ1 data center, which it purportedly leased directly from South China Innovations Park, and that the representative believes that Tencent, another technology company, did the same.  AC ¶ 53(b)-(d).  These allegations are implausible on their face because they directly contradict the terms of the lease agreement between South China Innovations Park and GDS subsidiary Guangzhou

Weiteng Construction Co., Ltd.  The lease clearly states that the GDS subsidiary is the sole leaseholder of the entire building comprising the GZ1 data center.  *See* Ex. 2 (lease agreement).[9]

Moreover, the Complaint's sole bases for making this allegation are the statements of an anonymous and unsworn "confidential witness" (referred to in the Complaint as Confidential Witness 2 ("CW2")).  AC ¶ 53(b)-(d).  The Complaint, however, alleges only that CW2 is a "representative" of Guangdong Zhonghe.  *Id*. ¶ 52(b).  The Complaint is thus utterly lacking in any description of the person's responsibilities and provides no basis whatsoever to conclude that CW2 had any knowledge about (i) the legal agreements under which Guangdong Zhonghe allegedly had access to a portion of the GZ1 data center; or (ii) whether Guangdong Zhonghe was a lessee of the property (as opposed to being party to a colocation services agreement).  *Id*. ¶ 52(b), (d).  In this Circuit, the allegations of such a confidential witness cannot be relied upon to bolster plaintiffs' claims where, as here, the complaint fails to provide a sufficient basis for concluding that the witness's purported statements have a sound factual underpinning.  *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (confidential witnesses must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."); *see also Glaser v. The9 Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) (discounting statement from employee of defendant company where complaint failed to describe witness with sufficient particularity, including "what [the CW's] job duties entailed"); *Feasby v. Industri-Matematik Int'l Corp.*, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (discounting allegations of "former employees or consultants" of

---

[9] The Complaint acknowledges the existence of the GZ1 lease and does not claim that it is fraudulent, inapplicable or inauthentic.  Indeed, the only statement that Plaintiffs make about the lease is that it has certain redactions.  AC ¶ 36.  However, the only redactions in the lease are its financial terms (*i.e.*, the rent that GDS is paying).  The redaction of such information provides no reasoned basis for questioning the validity of the lease.

software developer because "nowhere [ ] does the Complaint describe the position held by or work assignments of the former employee or consultant sources, or any other information that would support an inference that the sources would possess the information attributed to them").

CW2 has an even more attenuated basis to make any observation about the purported contractual arrangements under which Tencent, an unrelated entity, allegedly used the GZ1 data center, as the witness does not claim to have ever worked at Tencent and does not identify any basis for his or her purported knowledge about Tencent's contractual arrangements. AC ¶ 52(d); *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 691 (S.D.N.Y. 2008) (Kaplan, J.) (disregarding statements of confidential witness where complaint failed to explain how the witness, who did not work for defendant company "is likely to have known the relevant facts" at defendant company and the statements the witness made "lack[ed] detail that might suggest that [the witness] had personal knowledge."); *Glaser*, 772 F. Supp. 2d at 594 (discounting statements from CWs who did not work for defendant company where complaint failed to explain how witnesses had any contact with defendant company).

Under these circumstances, it is clear that CW2's statements are unreliable and should be disregarded. Moreover, the fact that CW2's statement contradicts the terms of the lease provides a further basis to disregard the statement entirely. *See Zucco Partners, LLC v. Digimarc Corp*, 552 F.3d 981, 999 (9th Cir. 2009) (finding a statement by a confidential witness that was "contradicted by readily available physical evidence" "too contradictory to be compelling").[10]

---

[10] The Complaint similarly seeks to rely on "CW1" for the proposition that South China Innovations Park owns the GZ1 building and does not permit subleases. AC ¶ 53(a). As discussed above, these allegations do not call into question the accuracy of any of GDS's statements. *See supra* at 17. Moreover, the Complaint's description of CW1 suffers from the same infirmities that prohibit reliance on the purported statements of CW2. The Complaint describes CW1 as a "client services representative" at South China Innovations Park, but fails to describe this individual's duties or to provide any basis from which the Court could conclude that he or she would know about South China's subleasing policy. Additionally, while not so stated in the Complaint, to the extent Plaintiffs claim to rely on statements made by third

### B.   Plaintiffs Fail to Allege Well-Pleaded Facts Showing that GDS's Disclosures Concerning its Data Center Acquisitions Were False

Plaintiffs further allege that GDS "lied about the purchase price of the three data center companies that it acquired in 2017 and 2018"—GZ2, GZ3, and SZ5.  AC ¶¶ 13-15, 58-72.  Specifically, Plaintiffs allege differences between GDS's U.S. SEC filings and the China SAIC filings of the acquired China-based entity within each target group:

> SAIC filings show that GDS acquired Shenzhen Yaode for a mere RMB 0.5 million, not RMB 312 million as GDS claimed in its SEC filings.  Similarly, SAIC filings show that GDS acquired Guangzhou Weiteng Network for RMB 72 million (not RMB 234 million per GDS' SEC filings), and that GDS acquired Guangzhou Weiteng Data for RMB 40 million (not RMB 262 million as GDS claimed in its SEC filings).

*Id*. ¶ 14.  But Plaintiffs' allegation that this reveals a "fraud" rests on the demonstrably incorrect assumption that SAIC and SEC filings report the same information.

The error in Plaintiffs' reasoning is apparent from the face of the disclosures: the data center acquisitions each comprised an entire group of companies, typically including an entity holding the IDC license, an entity holding the land-use or building rights, and a parent holding company.  *Id*. ¶¶ 58, 60, 62, 82–83; *see also* Ex. 2 to AC.  GDS's *SEC* filings reported the total acquisition price for the "target group" of companies for each data center, whereas the *SAIC* filings of the acquired China-based entity within each target group (which typically holds the IDC license and operates the data center) reported the acquisition price for just that entity, consistent with Chinese regulations.  *Compare* AC ¶¶ 58, 60, 62 (quoting GDS's disclosures regarding acquisition of a "target group" of entities in connection with each of the three data center acquisitions) *with id*. ¶¶ 6, 13, 14, 67–72 and Ex. 6 (BO Report) at 18, 24, 27, 38

---

parties to Blue Orca, or on Blue Orca's opinions and conclusions drawn from those statements, as set forth in the Blue Orca Report, those statements, opinions, and conclusions are unreliable and cannot be credited for the same reasons set forth above.

(discussing SAIC filings showing acquisition prices of just "three acquired companies").  Thus, the supposed "discrepancy" between the amounts set forth in GDS's SEC filings and the SAIC filings of the acquired Chinese entities is non-existent—Plaintiffs are comparing apples with oranges.

This Court is familiar with the difference between SEC and SAIC reporting requirements, and this Court, among others, has dismissed securities fraud claims in the past where plaintiffs similarly sought to plead falsity based on differences between the two reporting systems.  *See, e.g.*, *In re China Valves Tech. Sec. Litig.*, 2012 WL 4039852, at *5-6 (S.D.N.Y. Sept. 12, 2012) (Kaplan, J.) (difference in company's reported net income in SEC and SAIC filings failed to plead falsity where plaintiff "failed to allege facts to support that (1) the SEC figures, and not the [S]AIC filings, are false, and (2) any variation is not attributable to variations in reporting rules or accounting standards.") (citing cases); *Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012) (difference in profits that company reported to the SEC and with the Chinese government not false or misleading where profits reported to Chinese government "related only to [defendant's] subsidiaries and affiliated entities in … China, while in the registration statement, [defendant] reported its profits related to all entities").  *Katz v. China Century Dragon Media, Inc.*, 2011 WL 6047093, at *4 (C.D. Cal. Nov. 30, 2011) (difference in reported profits and revenue in SEC and SAIC filings "does not suffice to make … plausible" the claim that figures reported in the SEC filings were false).

Shortly after the Blue Orca Report came out, GDS explained to the market Blue Orca's (and now Plaintiffs') mistake, publishing a chart summarizing the transaction structure for each data center acquisition.  That chart is Exhibit 2 to the Complaint.  *See* AC ¶¶ 78, 80, 82–83 & Ex. 2 to AC.  Plaintiffs' retort was to challenge GDS's business decision to acquire certain entities

within the target groups associated with the SZ5 and GZ2 data centers.  *See* AC ¶¶ 86-87.  But

second-guessing a company's business decisions does not state a claim for securities fraud.

*Harris*, 135 F. Supp. 3d at 171 ("Disagreement with [Defendants'] judgment calls is insufficient

to allege that [Defendant] misstated facts in its consolidated financial statements in violation of

Section 10(b)…..").

Even if this Court were to delve into Plaintiffs' attempts to second-guess GDS's business

decisions—which it need not—those challenges go nowhere.  Specifically, as it concerns the

SZ5 data center, Plaintiffs allege that GDS (i) did not need to acquire the License Co. of the

target group because that entity "did not have an IDC license, … [but] was actually operating the

data center under GDS Beijing's IDC license," and (ii) overpaid to acquire the Asset Co., which

purportedly leased "a tiny 25 square meter … room" at the SZ5 data center, and had a net

operating loss in 2017.  AC ¶ 86(a)-(d).  But GDS ***disclosed*** all of these facts in its 20-F Report,

including that the License Co. (which Plaintiffs allege GDS acquired for only USD $33,000) was

operating under GDS Beijing's IDC license, that the data center had "just commenced

operations," that the Asset Co. had a net loss of RMB 23 million for the second half of 2017, and

detailing its basis for valuing the purchase price of the target group.  Ex. 3 (20F-Report) at 54,

103, F-34.  Further, Plaintiffs plead no facts suggesting that GDS could have acquired the SZ5

data center without acquiring the License Co., or that the Asset Co.—which GDS acquired for

the assets it held, including the data center itself, not just the "tiny room" it used as an office—

was not fairly valued by GDS.  There is simply no plausible basis to allege falsity on this record.

As for the GZ2 data center, Plaintiffs claim that it was unnecessary for GDS to acquire

the Asset Co. of the target group because, allegedly, the License Co. also held the property lease

and owned the physical assets of the data center.  AC ¶ 86(e).  But this allegation is based on a

*non-sequitur* that because the License Co. held *certain* assets on its balance sheet, that it must have held *all* of the relevant data center assets.  The Complaint does not allege, nor can it, that the Asset Co. held no assets, or, more importantly, that GDS could have acquired the GZ2 data center without acquiring the Asset Co.  In short, Plaintiffs' attempts to second-guess GDS's management decisions or to raise non-existent red flags are speculative and do not plead a case for securities fraud.

## II.    The Complaint Fails To Adequately Plead Scienter

Plaintiffs' claims should be dismissed for the separate and independent reason that the Complaint fails to plead facts giving rise to a strong inference of scienter against any Defendant. Such an inference must be "cogent and at least as compelling as any opposing inference of non-fraudulent intent."  15 U.S.C. § 78u-4(b)(2)(A); *ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quotation omitted).  "In determining whether this inference can be reasonably drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively."  *ECA*, 553 F.3d at 198.  If a fraudulent inference is not "at least as compelling" as a non-fraudulent one, it must be rejected, even "in a close case."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010).

To plead an individual defendant's scienter, a complaint must "allege facts to show either (1) that the defendants had the motive and opportunity to commit fraud or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA,* 553 F.3d at 198. (citation omitted).[11]

---

[11] The scienter of each defendant must be considered separately: "Conclusory statements of associations or generalized allegations of scienter against *groups of defendants* will not state a claim for securities fraud.  Plaintiff must plead specific facts as to *each defendant* that (1) give rise to a strong inference that the defendant had both motive and opportunity to commit fraud or (2) provide strong circumstantial

To plead a corporate defendant's scienter, a complaint must plead facts "creat[ing] a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Sfiraila v. Deutsche Bank Aktiengesellschaft,* 729 Fed. App'x 55, 58 (2d Cir. 2018).  Plaintiffs meet none of these standards.

### A.    Scienter Is Not Adequately Pleaded As To Either Of The Individual Defendants

#### 1.    The Complaint Does Not Plead That The Individual Defendants Had A Motive To Commit Fraud

The Complaint fails to plead that either of the Individuals Defendants—CEO Huang and CFO Newman—had a motive to commit fraud, which requires a showing that "defendants benefitted in some concrete and personal way from the purported fraud.  This is typically done by alleging that corporate insiders made material misrepresentations in order to profit from the sale of their own shares." *In re Tempur Sealy Int'l Sec. Litig.*, 2019 WL 1368787, at *14 (S.D.N.Y. Mar. 26, 2019) (Kaplan, J.) (quotation omitted).  Nothing of the sort is alleged here. The Complaint pleads no facts suggesting that Messrs. Huang or Newman sold any stock or otherwise personally profited from the alleged frauds.  The Complaint baselessly speculates, in connection with alleged "Fraud 2," that certain unidentified "GDS insiders" "siphon[ed] off" some unstated amount of funds in connection with the three data center acquisitions, AC ¶¶ 73-77, but provides no factual allegations supporting the existence—let alone the details—of this purported criminal scheme, and does not connect it to Messrs Huang or Newman.  The absence of any such motive allegations is fatal to Plaintiffs' ability to plead scienter based on motive and opportunity.  *See, e.g., Kalnit v. Eichler*, 264 F.3d 131, 140-42 (2d Cir. 2001) (no scienter based

---

evidence of 'conscious misbehavior or recklessness."  *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 428 (S.D.N.Y. 2010) (emphasis added).

on motive where complaint failed to allege that defendants personally benefited from alleged fraud); *Rombach*, 355 F.3d at 177 (complaint's failure to plead how defendants personally benefited from alleged fraud required dismissal of 10b-5 claims).

> 2.   *Plaintiffs Fail to Allege Well-Pleaded Facts Showing That The Individual Defendants Consciously Misbehaved Or Acted With Deliberate Recklessness*

The Complaint also fails to plead conscious misbehavior or deliberate recklessness by either Individual Defendant.  The showing necessary under this standard is "*not merely a heightened form of negligence*," *S. Cherry St., LLC v. Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in original), but "a state of mind *approximating actual intent*," *id*., requiring allegations of "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142.  Moreover, Plaintiffs' failure to include any motive and opportunity allegations in the Complaint significantly increases their pleading burden for this prong of the scienter analysis.  "Where, as here, a complaint fails adequately to allege motive, the strength of circumstantial allegations of conscious misbehavior must be correspondingly greater." *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 219 (S.D.N.Y. 2009) (Kaplan, J.).  However, once again, Plaintiffs provide no well-pleaded scienter allegations based on conscious misbehavior or deliberate recklessness.

Plaintiffs' scienter allegations rest primarily on the fact that Messrs. Huang and Newman signed SOX certifications attesting that the 20-F Report "does not contain any false statements," and that Mr. Huang also signed the 20-F Report.  AC ¶ 42.  These types of boilerplate allegations are plainly deficient to plead scienter, as courts in this circuit have repeatedly held.  *Zheng*, 379 F. Supp. 3d at 181 (signing SOX certifications insufficient) (collecting cases); *Goplen v. 51Job, Inc.*, 453 F. Supp. 2d 759, 775 (S.D.N.Y. 2006) (allegation that CEO "signed the SEC filing –

25

without specific allegations of reasonably available facts that should have put him on notice that the reported financial results were false – does not give rise to a strong inference of scienter.").[12]

The Complaint also asserts that Messrs. Huang and Newman's public denials of the Blue Orca Report's allegations on the August 14, 2018 earnings call constitute direct evidence of scienter.  AC ¶¶ 82–89.  To the contrary, Defendants' rebuttal of fraud allegations made by a biased short seller fails to plead facts giving rise to a strong inference of conscious misbehavior or recklessness, particularly where, as here, none of Blue Orca's allegations have ever been substantiated, GDS has continued to grow and prosper and its stock price is now 38% higher than its level at the time of the 2018 short seller attack.  *See supra* at p. 10.  In any event, nothing Messrs. Huang or Newman said on the August 14 call suggests that they possessed information contrary to any statements contained in GDS's SEC filings when they were filed, as is required to plead scienter.  *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 774 (S.D.N.Y. 2019) ("Second Circuit cases uniformly rely on allegations that [1] <u>specific</u> contradictory information was available to the defendants [2] <u>at the same time</u> they made their misleading statements.") (emphasis in original).  Indeed, Plaintiffs fail to allege facts showing that either Individual Defendant—to this date—possesses any information contradicting any GDS public statement.

The Complaint also contains the conclusory assertions that Messrs. Huang and Newman were "privy to confidential proprietary information concerning [GDS] and its business," "directly or indirectly involved in the oversight or implementation of the Company's internal

---

[12] *See, also, e.g.*, *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) ("Plaintiff cannot raise an inference of fraudulent intent based on the signing of a [SOX] certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements."); *N. Collier Fire Control and Rescue Dist. Firefighter Pension Plan and Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *22 (S.D.N.Y. Sept. 30, 2016) ("allegations that certain defendants signed SEC filings" insufficient to raise strong inference of scienter); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 162-63 (S.D.N.Y. 2015) (signing SEC filings alleged to contain misrepresentations going to company's "core operations" insufficient).

controls," and "aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company" based on their positions as CEO and CFO. AC ¶¶ 27, 110, 116-18. But such conclusory allegations are routinely rejected in securities fraud cases as insufficient "boilerplate" because they lack any factual content, such as the specific "confidential proprietary information" allegedly at their disposal, when they had it, and how it allegedly differed from GDS's disclosures. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *Goplen*, 453 F. Supp. 2d at 775 (holding that similar allegations were "bare" and lacked "any further facts or details" necessary to "adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements."). Indeed, these allegations are very similar to those Plaintiffs' counsel made in *Zheng*,[13] which the court held insufficient to plead scienter. 379 F. Supp. 3d at 181.

Taken together, Plaintiffs' allegations do not even come close to pleading facts giving rise to a strong inference of scienter as to either of the Individual Defendants. They fail to allege "deliberate, illegal behavior, or highly unreasonable conduct," as the PSLRA requires. Instead, they show only that Messrs. Huang and Newman believe that GDS's SEC filings are accurate

---

[13] In *Zheng*, plaintiffs alleged that the two named defendants "(1) 'directly participated in the management of' [the defendant company]; (2) were 'directly involved in the day-to-day operation of [defendant company] at the highest levels'; (3) were 'privy to confidential proprietary information concerning [defendant company] and its business and operations;' (4) were 'directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged' in the amended complaint; [and] (5) were 'directly or indirectly involved in the oversight or implementation of [defendant company's] internal controls.' ... Specifically, as to [d]efendant Zhuo, [p]laintiff further alleges that he is 'intimately involved in all aspects of [defendant company's] operations.'" *Zheng*, 379 F. Supp. 3d at 181 (quoting amended complaint). The court found that these allegations were not "particularized" and "far from sufficient, standing alone, to raise a strong inference of scienter." *Id.* (quotation omitted).

and that Blue Orca's allegations are baseless—assertions that remain unrebutted to this date.  To find a strong inference of scienter based on the purely boilerplate allegations alleged here would run contrary to the PSLRA's requirements and all but eliminate the scienter element in 10b-5 cases.  Accordingly, the Court should dismiss the Complaint against the Individual Defendants on the separate and independent basis that Plaintiffs have failed to adequately plead scienter.

### B.      Scienter Is Not Adequately Pleaded Against GDS

A plaintiff can plead corporate scienter by showing that "someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 301-02 (S.D.N.Y. 2019).  While there is no "bright-line rule to determine which employees' scienter may be imputed to a corporation, … management level employees are, ordinarily, sufficiently senior to serve as proxies for the corporation's mental state."  *Id*.  Here, as discussed above, the Complaint fails to adequately plead facts giving rise to a strong inference of scienter as to Messrs. Huang or Newman, and fails to identify anyone else at GDS who acted with the requisite intent.  Accordingly, the Court should dismiss the Complaint against GDS for failure to allege facts giving rise to a strong inference of scienter.

### C.      Plaintiffs' Scienter Allegations Are Neither Cogent Nor Compelling

The Second Circuit has held that a complaint's scienter allegations "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," to pass muster in response to a motion to dismiss.  *ECA*, 553 F.3d at 198; *see also Glaser*, 772 F. Supp. 2d at 591 (same).  For the reasons discussed above, none of Plaintiffs' allegations about alleged "Fraud 1" or "Fraud 2" satisfy that standard.  The remaining allegations in the Complaint, viewed holistically, fail to meet the strict scienter pleading standard.  In particular, Plaintiffs allege that: (i) GDS has been a "serial raiser of capital since 2015," AC ¶ 74; (ii) GDS keeps cash balances outside China, *id*. ¶¶ 15, 76-77; and (iii) GDS had large "unbilled accounts receivables" in 2016

and 2017, *id*. ¶¶ 90-94.  Far from suggesting any wrongdoing or fraudulent intent, all of these

facts were disclosed in GDS's 20-F Report, as the Complaint acknowledges, and give rise to no

inference of scienter at all.  *See* Ex. 3 (20-F) at 106-115, 138 (disclosing GDS's capital-raising

activities), F-25 (disclosing where GDS keeps its cash and in what currencies), 3, F-7, F-15, F-29

(discussing GDS's accounts receivable billing practices and amounts unbilled).

The fact that GDS has tapped the capital markets multiple times since 2015 is not

surprising given the capital-intensive nature of its business and its strong growth, and thus is not

suspicious.  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 531-32 (S.D.N.Y. 2009),

*aff'd sub nom. Condra v. PXRE Grp., Ltd.*, 357 Fed. App'x 393 (2d Cir. 2009) (allegations that

defendants lied to raise capital insufficient to plead scienter) (collecting cases).  Nor is it

suspicious that GDS keeps significant funds outside China.  As a Cayman Island-incorporated

company, it is generally *required* to do so under Chinese regulations and is restricted from

moving money onshore except for qualifying and approved purposes.  Ex. 3 (20-F) at 38, 40, 42,

75-76, 106-07; *see* also Ex. 1 (Am. F-1 Reg. Stmt.) at 51-52, 56.  As to unbilled accounts

receivables, Defendants disclosed that while GDS recognizes revenue when it renders its

services, in accordance with U.S. generally accepted accounting principles, Ex. 3 (20-F) at 93, F-

2, F-10, F-19, F-20, GDS's practice is to bill its customers monthly or quarterly in arrears,

consistent with industry practice, which means that its accounts go unbilled for some length of

time, *id*. at 93; *see also* Ex. 8 (Q2 2018 Earnings Call Tr.) at 6.  The Complaint utterly fails to

explain how these facts somehow support a strong inference of scienter.  They do not.  *See, e.g.*,

*In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 398-400 (S.D.N.Y. 2016) (failure to plead specifics

of "the underlying conduct" including what information was known, when it was known, and

how it contradicted defendants' statements required dismissal).  In sum, Plaintiffs fail to allege

any well-pleaded facts giving rise to any inference of scienter, let alone the strong inference of scienter that the law demands, requiring dismissal.

### III.   The Complaint Fails to Adequately Plead Loss Causation

The Complaint is also subject to dismissal because it does not adequately plead loss causation.  Plaintiffs must allege that the identified "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173.  However, the loss causation requirement is not met where the alleged losses arise from a stock price drop following an investor report that merely opines upon, characterizes or repackages information that was already publicly available.  Here, the Blue Orca Report was just such a publication; it was admittedly a statement of opinion based solely on publicly available information, precluding Plaintiffs from pleading loss causation based on GDS's stock price drop following the Report's publication.

The Second Circuit's decision in *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010), is controlling on this issue.  In that case, the plaintiff alleged that information contained in a news article—about a company's former audit committee chair resigning after raising questions about a disclosed corporate transaction and how it was accounted for—constituted a partial corrective disclosure of fraud.  *Id.* at 511.  However, the court found that the news article did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint," because the transaction and how it was accounted for were "known to the market a year before" the director's resignation.  *Id.*  Hence, the article was "a negative characterization of already-public information," and "[a] negative journalistic characterization of previously disclosed fact does not constitute a corrective disclosure of anything but the journalists' opinions."  *Id.* at 512.  Thus, the Second Circuit held that because plaintiff "failed to demonstrate any new information in the [news article] regarding

30

Omnicom's alleged fraud, [plaintiff] has failed to show a price decline due to a corrective disclosure." *Id.* at 513.[14]

Other Circuit Courts of Appeal have reached the same conclusion.  For example, in *Meyer v. Green*, 710 F.3d 1189, 1199 (11th Cir. 2013), the Eleventh Circuit held that a report by a short seller based on information "obtained from publicly available sources" was not a corrective disclosure because it disclosed no new facts to the market, even though "it contained in-depth analysis of information not readily available to the investing public."  The Fourth Circuit in *Teachers' Retirement System of Louisiana v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007), held that allegations in a complaint filed against the co-founder and chairman of the board of a company by another co-founder could not constitute a corrective disclosure in a separate securities class action lawsuit because it "disclose[d] nothing new, but merely attributes an improper purpose to the previously disclosed facts."  And the Third Circuit in *In re Merck & Co., Inc. Securities Litigation*, 432 F.3d 261, 270–71 (3d Cir. 2005), found that a *Wall Street Journal* article interpreting facts disclosed by the company two months earlier was not corrective.

These cases all recognize that the efficient market hypothesis (a necessary predicate in fraud-on-the-market cases such as this one) assumes that publicly available information is incorporated into a company's stock price in real time.  Accordingly, a stock price drop following publication of an analyst report or news article opining on facts that are already publicly available can be attributed, at most, to the market reacting to the *opinions* and *characterizations* of those already-public facts, not the facts themselves.  As the Eleventh Circuit

---

[14] While *Omnicom* was decided on a motion for summary judgment, the Second Circuit and numerous courts in this district have applied *Omnicom* at the motion to dismiss stage to dismiss Rule 10b-5 claims for lack of loss causation under circumstances similar to those here. *See, e.g.*, *Cent. States, Southeast & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 Fed. App'x 72, 74 (2d Cir. 2013) (Summary Order); *In re CRM Holdings, Ltd. Sec. Litig.*, 2013 WL 787970, at *6 (S.D.N.Y. Mar. 4, 2013); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012).

explained in *Meyer*, "[h]aving based their claim of reliance on the efficient market theory, the Investors must now abide by its consequences."  710 F.3d at 1198.

District courts within this Circuit have reached the same conclusion in cases very similar to this one.  For example, in *Zheng* and *Fila*, both courts dismissed securities fraud claims with prejudice, in part for failing to adequately plead loss causation where plaintiffs relied on reports analyzing publicly available facts in the company's SEC filings and elsewhere to allege that the company was committing fraud.  *Fila*, 195 F. Supp. 3d at 496-97; *Zheng*, 379 F. Supp. 3d at 177-79.  *Zheng* makes clear that the same result applies even where the publicly available materials are hard to find and/or in a different language.  In that case, the alleged stock drop followed an investor report that relied on publicly available foreign language materials, including "obscure" and not easily obtainable Indonesian news articles, government publications, court filings, and court decisions; a Chinese embassy news release; Chinese Hukou records (household registration documents); "maritime databases that track ocean fleets;" and company promotional videos, which the short seller translated for purposes of its report.  379 F. Supp. 3d at 169, 178 (citing investor report detailing source materials).  Notwithstanding the foreign language and "obscure" nature of the source materials, the court found that the report "did not reveal any undisclosed information.  Rather, the [report] relied on public information and merely represented the author's opinion that [the defendant company's] 'shares are likely worthless' and that 'shareholders are likely to be left with total losses.'"  *Id.* at 178.

The same result applies here.  Although the Complaint alleges that the Blue Orca Report "exposed" Defendants' alleged frauds, causing GDS's stock price to decline, AC ¶ 8, the Blue Orca Report makes clear that it is based entirely on publicly available information.  The Report admonishes readers on the first page that "*THIS RESEARCH REPORT EXPRESSES SOLELY*

*OUR OPINIONS*" and, at the end, states that "**We conducted research and analysis based on publicly available information in a manner that any person could have done if they had been interested in doing so.  You can publicly access any piece of evidence cited in this report or that we relied on to write this report.**"  Ex. 6 at 1, 53 (emphasis added).  Lest any reader overlook these disclaimers, the Report is peppered with reminders that its "opinion" is based on "public records," "publicly available information," and "public sources," including, among other things, GDS's SEC disclosures, its Chinese regulatory filings, and public websites.[15]  The Report revealed no new, material "facts" to the market; rather it gathers existing, publicly available information, and opines that such information reveals an alleged fraud.  It is no different than other short seller reports and news articles that courts have held insufficient to allege loss causation.  Accordingly, under *In re Omnicom* and the other cases discussed above, loss causation is lacking here, requiring dismissal as a matter of law.

---

[15] *See, supra* n.8.  Similarly, Plaintiffs describe their investigation that "confirmed" certain alleged facts in the Blue Orca Report as consisting of website searches, reviews of public filings, and telephone calls with representatives of certain data center occupants.  AC ¶¶ 53, 85(d).

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the action with prejudice.

DATED:      December 6, 2019
              New York, New York

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By:     */s/ James G. Kreissman*     

James G. Kreissman
Alan C. Turner
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: jkreissman@stblaw.com
Email: aturner@stblaw.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of December 2019, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ James G. Kreissman*

James G. Kreissman