UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
HAMZA RAMZAN, individually and on behalf of all
others similarly situated,

                         Plaintiff,

            -against-                                          19-cv-9154 (LAK)


GDS HOLDINGS LIMITED, WILLIAM WEI HUANG,
and DANIEL NEWMAN,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                    **MEMORANDUM OPINION**

                    Appearances:

                         Laurence Rosen
                         Phillip Kim
                         Yu Shi
                         Jing Chen
                         THE ROSEN LAW FIRM, P.A.
                         *Attorneys for Lead Plaintiffs*

                         James G. Kreissman
                         Alan C. Turner
                         SIMPSON THACHER & BARTLETT LLP
                         *Attorneys for Defendants*


LEWIS A. KAPLAN, *District Judge.*

            In July 2018, short seller Blue Orca Capital released a report accusing defendant

GDS of engaging in fraudulent conduct. GDS's share price fell approximately 37 percent

following the report's publication. Plaintiffs[1] seized on these allegations and now bring claims

---
[1]

        Plaintiff Hamza Ramzan filed this putative class action in the Eastern District of Texas. DI 1.
        The court later appointed Yuanli He as the lead plaintiff [DI 20], who filed the amended
        complaint ("AC") [DI 21] with himself and Michael Zollo as the named plaintiffs.

under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against GDS and two GDS executives based on the conduct described in Blue Orca's report. The matter is before the court on defendants' motion to dismiss the amended complaint. For the reasons set forth below, defendants' motion is granted.

*Background*

Defendant GDS is a Cayman Islands company headquartered in China.[2] GDS develops, acquires, and operates data centers in China, including in Guangzhou and Shenzhen.[3] The company provides its data center customers – which include financial intuitions, telecommunication and IT service providers, and other private sector and multinational corporations – with colocation services, among others.[4] The colocation service provides GDS customers with physical space, power supply, and other services necessary to operate the customers' IT systems.[5] Profits from this service accounted for over 70 percent of GDS's total revenue from 2015 through 2017. [6]

The alleged fraud concerns four of GDS's data centers: GZ1, GZ2, and GZ3 in Guangzhou, and SZ5 in Shenzhen. GZ1, located in what is called the G6 data building in the Guangzhou Innovations Park, was acquired in May 2016, six months before GDS held its initial

---

[2] AC ¶ 23.

[3] *Id.* ¶ 31.

[4] *Id.*

[5] *Id.*

[6] *Id.*

public offering ("IPO").[7] In its 2017 Form 20-F report, GDS reported that, as of December 31, 2017**,** the company had received commitments from customers to use 100 percent of GZ1's "usable space" (the "commitment rate") and that 90 percent of the usable space had begun to generate revenue (the "utilization rate").[8] Presentation slides used during GDS's 2018 Q1 earnings call, which was hosted by William Wei Huang (founder, chief executive officer, and chairman of the board of directors) and Daniel Newman (chief financial officer), stated that GZ1's utilization rate had increased to 93.7 percent.[9]

   The 2017 Form 20-F stated also that the company in June 2017 had purchased SZ5 for RMB 312 million (approximately $48 million) and that in October 2017, GDS had purchased GZ2 for RMB 234 million (approximately $36 million).[10] Huang signed this form, and he and Newman signed the accompanying Sarbanes-Oxley Act of 2003 ("SOX") certification verifying that the 2017 Form 20-F did not contain any false statements.[11] In a May 2018 Form 6-K, GDS disclosed that it had acquired GZ3 for RMB 262 million (approximately $41.1 million).[12]

   On July 31, 2018, short seller Blue Orca Capital released a report alleging that GDS had issued false information concerning GZ1, GZ2, GZ3, and SZ5.[13] The report claimed that GDS engaged in fraudulent conduct because (1) it did not operate or derive any revenue from GZ1 (the

---

[7]   *Id.* ¶¶ 33-35.

[8]   *Id.* ¶ 38.

[9]   *Id.* ¶ 44.

[10]   *Id.* ¶¶ 58-61.

[11]   *Id.* ¶ 42.

[12]   *Id.* ¶ 62.

[13]   *Id.* ¶¶ 8-9.

"commercialization fraud") and (2) the acquisition prices for GZ2, GZ3, and SZ5 stated in GDS's SEC filings were materially overstated (the "acquisition fraud").[14]   Additionally, the report questioned a 9.7 percent loan taken by the company, the large amount of unbilled accounts receivable – 59 percent of GDS's total accounts receivable in 2016 and 70 percent of GDS's total accounts receivable in 2017 – and the company's practice of keeping 65 percent of its cash outside of China.[15]

Blue Orca's opinions were based largely on its review of public information.[16]  The report cited as evidence of the commercialization fraud lease agreements, blue prints of G6, and other publicly available information, some of which included Chinese-language documents and websites, as well as its conversations with representatives from two companies operating out of G6.[17]  Plaintiffs claim to have corroborated this information by using their own investigator and by speaking with two confidential witnesses.[18] The acquisition fraud allegations were based on Blue Orca's review of GDS's SEC filings and its Chinese Administration for Industry and Commerce ("SAIC") filings, as well as shareholder resolutions contained therein.[19]   Plaintiffs

---

[14]

   *Id.* ¶¶ 46-52, 72-73.

[15]

   *Id.* ¶¶ 76-77, 90-93.

[16]

   The report states explicitly that "we conducted research and analysis based on public information in a manner that any person could have done if they had been  interested in doing so. You can publicly access any piece of evidence cited in this report or that we  relied  on  to  write this report." Declaration of Alan Turner [DI 59] Ex. 6, Blue Orca Report [hereinafter "BO Report"] at 53.

[17]

   AC ¶¶ 48-50; BO Report at 6-17.

[18]

   *Id.* ¶¶ 53-56.

[19]

   *Id.* ¶ 64.

assert that the resolutions, which contain the property acquisition prices, must be obtained in person.[20]

The Blue Orca report acknowledged that Blue Orca had "a short interest in GDS's stock and therefore st[ood] to realize significant gains in the event that the price of such instrument declines."[21]  The GDS share price did fall following the report's release, dropping from a close of $34.75 on July 30, 2018, to a close of $21.83 on July 31, 2018. [22]

On August 1, 2018, GDS issued a press release denying Blue Orca's allegations.[23] Two weeks later, on its August 14, 2018 earnings call, Huang and Newman reiterated that the Blue Orca report was incorrect.[24]

Plaintiffs filed this action on August 2, 2018. They assert claims under the Sections 10(b) and 20(a) of the Exchange Act against GDS and against current GDS executives Huang and Newman (the "Individual Defendants").  Parroting Blue Orca's allegations, plaintiffs allege that (1) GDS's disclosures regarding the GZ1 data center falsely stated the commitment rate and utilization rate, and that (2) in its SEC filings, GDS listed false acquisition prices of the GZ2, GZ3, and SZ5 data centers.

Defendants move to dismiss for failure to allege a material misstatement, *scienter*, or loss causation.  Because the Court agrees that the amended complaint does not adequately allege *scienter*, defendants' motion is granted.[25]

---

20

   Declaration of Jing Chen [DI 61] ¶ 10.
21

   BO Report at 1.
22

   AC ¶ 16.
23

   *Id.* ¶ 78.
24

   *Id.* ¶ 82.
25

*Discussion*

I.       *Legal Standards*

        To survive a motion to dismiss, a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face."[26] The Court accepts as true all well-pleaded factual allegations and "draw[s] all reasonable inferences in the plaintiffs' favor."[27] However, it is not obliged to accept as true "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[28]

        A private plaintiff alleging a violation of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, must prove that the alleged material misstatements or omissions were made with *scienter*—an "intent to deceive, manipulate, or defraud."[29]  To do so, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with" *scienter*.[30] A plaintiff satisfies this requirement by alleging facts sufficient to show that (1) "defendants had both motive and opportunity to commit the fraud" or (2) "constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness."[31]  To allege corporate *scienter*, a complaint

---

[26]      Because the Court finds that the amended complaint must be dismissed on these grounds, it does not address defendants' additional arguments.

[27]      *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).

[28]      *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).

[29]      *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

[30]      *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

[31]      15 U.S.C. § 78u-4(b)(2)(A).

        *Kalnit*, 264 F.3d at 138.

must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite *scienter*."[32]

II.     *Scienter*

    A.     *Motive and Opportunity*

To allege *scienter* based on motive and opportunity, a plaintiff must allege the existence of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," as well as "the means and likely prospect of achieving concrete benefits by the means alleged."[33]

    1.  *Individual Defendants*

As corporate executives at GDS, the amended complaint alleges adequately that Huang and Newman had the opportunity to commit fraud.[34] However, it offers no allegations that either had a motive to do so. Accordingly, the amended complaint fails to allege motive and opportunity as to the Individual Defendants.

    2.     *GDS*

The "most straightforward" way to raise an inference of corporate *scienter* is to plead *scienter* for an individual defendant.[35] Plaintiffs have not even attempted to do so.

---

[32] *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[33] *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

[34] *See Chill v. Gen. Elec. Co.,* 101 F.3d 263, 267 (2d Cir. 1996).

[35] *Teamsters Local 445*, 531 F.3d at 195.

As to the acquisition fraud, plaintiffs allege that GDS inflated the purchase price of its GZ2, GZ3, and SZ5 acquisitions so that unnamed "GDS insiders could siphon off the difference."[36]  Motive to do so is evidenced by GDS's decision to keep 65 percent its money outside China, where it "easily looted by insiders" but "useless" to operate the company's data centers in China.[37]  Quoting from the Blue Orca report, the amended complaint alleges that "[i]f your goal was to loot money from a U.S.-listed Chinese company, you would want to keep as much cash offshore, and in currencies other than RMB, because of China's strict capital controls" that make it difficult for companies to transfer money out of China.[38]

Plaintiffs attempt to bolster this theory by pointing to the fact that (1) for one loan taken by a GDS subsidiary in 2017 – that was disclosed in GDS's 2017 Form 20-F – GDS borrowed funds in China at a high interest rate of 9.7 percent while the unused cash balance in offshore accounts was generating approximately 0.6 percent in interest, (2) GDS has been a "serial capital raiser since 2015," and (3) in 2016 and 2017 GDS had a large amount of accounts receivable, income that a company has recognized as revenue, but it had not yet billed the buyers.[39]

Plaintiffs claim that GDS's high interest rate on the single loan in 2017 is evidence of defendants' motive to commit fraud because it reveals that GDS "clearly has the need for cash in China" yet elected to take "massive loans" in that country rather than transfer in money from its offshore account.[40]  In other words, according to plaintiffs, "GDS borrow[ed] a up to 9.7% interest

---

[36]     AC ¶ 73.

[37]     *Id.* ¶ 15.

[38]     *Id.* ¶ 77.

[39]     *Id.* ¶¶ 74-77, 88, 91-93.

[40]     *Id.* ¶ 88.

in China for the privilege of earning .6% interest on its cash sitting offshore," where "senior management can easily steal it."[41] Raising capital was suspect, according to plaintiffs, because "if Defendants have to raise billions of dollars in funds because operating data centers is a cash-intensive business, then the money should be in China and in RMB, not sitting overseas generating virtually no interest."[42] Finally, that GDS had 59 percent (2016) and 70 percent (2017) in unbilled accounts receivable allegedly supports a strong inference of *scienter* because, "if revenue cannot be tied to a specific invoice, the lack of a paper trail makes it difficult for auditors to check the authenticity of the receivables and the underlying revenue."[43] In turn, it becomes "easy" for GDS to fabricate its revenue.[44]

Plaintiffs' allegations are couched in conditional language and speculation. Missing from the amended complaint are allegations that anyone at GDS *did* misappropriate company funds or *in fact* raised capital for any illicit purpose. Moreover, actively raising capital is a goal shared by all issuers and, without more, is insufficient to support an inference of *scienter*.[45] Nor does a *single* loan borrowed at a high interest rate or unbilled accounts receivable, coupled with the alleged *potential* for GDS executives to embezzle funds, evidence malfeasance. These

---

[41]

[42] Plaintiffs' Opposition to Defendants' Motion to Dismiss [DI 60] at 25.

[43] *Id.*

[44] AC ¶ 93.

[45] *Id.* ¶ 94.

*See ECA Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (rejecting an argument that increased compensation—a generalized business motive—can be the basis for demonstrating *scienter*); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 533 (S.D.N.Y. 2009) ("[I]f scienter could be pleaded on [the basis of raising capital] alone, virtually any company that attempted to raise capital, especially in a woeful economic climate, would face specious securities fraud allegations.") (collecting cases).

allegations are insufficient to satisfy the heightened pleading standard required by Rule 9 and the PSLRA.

Finally, as to the commercialization fraud, plaintiffs argue that the acquisition of GZ1 six months before the company held its IPO demonstrates defendants' motive to commit fraud. The amended complaint alleges only the timing of the IPO.[46] The Court cannot infer *scienter* based only on the proximity of one corporate action to another.

Plaintiffs have not sufficiently pled motive to commit the alleged fraud.

### B.    *Conscious Misbehavior or Recklessness*

To allege recklessness sufficiently, plaintiffs must plead facts sufficient to show that a defendant's conduct was "highly unreasonable" and represented "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[47] Where, as here, plaintiffs have failed to plead motive, "the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater."[48]

### 1.    *Individual Plaintiffs*

To allege adequately that defendants knew or had access to facts that contradicted their public statements, plaintiffs must "specifically identify the reports or statements containing this information."[49] Yet the amended complaint lacks any such allegations. Instead, plaintiffs

---

[46]    AC ¶ 33.

[47]    *Kalnit*, 264 F.3d at 142.

[48]    *Id*.

[49]    *Novak*, 216 F. 3d at 309.

allege that Huang and Newman were "directly involved in the day-to-day operations of the Company at the highest levels," "privy to confidential proprietary information concerning [GDS] and its business and operations," "directly or indirectly involved in the oversight or implementation of the Company's internal controls," and "control[led] the contents of the various reports, press releases and public filings."[50]  In sum, "[b]ecause of their senior positions, Huang and Newman knew the adverse non-public information about GDS' misstatements" made in SEC filings and made on the 2018 Q1 earnings call. [51]  Such allegations do not suffice.   It is well established that *"[s]cienter* cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information."[52]

The amended complaint's allegations as to Huang and Newman's comments on the August 14, 2018 call disputing Blue Orca's report are similarly deficient.   It alleges that "Defendants' explanations are false exculpatory statements, and the fact that Huang and Newman offered these false explanations means that they were aware of the fraud and intended to deceive the investing public."[53]  That is, according to plaintiffs, if they allege falsity, no more is required to demonstrate *scienter*.  This is a fundamental misstatement of the law.  *Scienter* and falsity are

---

[50]

AC ¶¶ 27, 118.

[51]

*Id.* ¶ 116.

[52]

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y.2007) (citation omitted).

Plaintiffs' reliance on *Cohen v. Koening*, 25 F.3d 1168 (2d Cir. 1994), is misplaced.  There, the Second Circuit concluded that allegations similar to those included in plaintiffs' amended complaint were sufficient to allege *scienter*.  *Id.* 1174.  However, that case was decided prior to the PSLRA's enactment and the allegations there were held only to Rule 9(b)'s less exacting standard for *scienter*.

[53]

AC ¶ 89.

two distinct elements of a Section 10(b) claim. While the analysis as to different elements of a Section 10(b) claim at times may overlap, adequately pleading falsity is not a substitute for adequately pleading *scienter*. Accepting plaintiffs' "buy one get one free" approach to the law would obviate Section 10(b)'s requirement to allege *scienter* and Rule 9 and the PSLRA's requirement to plead allegations of fraud with particularity.

Plaintiffs place undue weight on Huang and Newman's signatures on GDS's SOX certificate. They contend that the Individual Defendants either signed the documents containing the alleged false information, knowing of their falsity, or were reckless in issuing the certificates because they had, and neglected, a duty to familiarize themselves with GDS's operations and financials.

While "signing the SOX certifications might be indicative of *scienter*, [a] plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements."[54] Here, as detailed above, plaintiffs have not provided facts sufficient to allege awareness or recklessness, and instead rely on general allegations about the Individual Defendants' senior position within the company. These conclusory allegations cannot withstand the motion to dismiss.

---

[54]

*Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (citations omitted).

2.    *GDS*

Having failed to plead facts sufficient to give rise to a strong inference of *scienter* as to Huang or Newman, or to allege facts concerning the intent of any other individuals at GDS, the amended complaint does not plead *scienter* as to GDS.

*III.*    *Section 20(a)*

Because plaintiffs have not alleged a primary violation of the Exchange Act, their claims under Section 20(a) are dismissed.[55]

*Conclusion*

Accordingly, defendants' motion to dismiss [DI 57] is granted.

SO ORDERED.

Dated:        April 7, 2020

Lewis A. Kaplan
United States District Judge

---

55

*Rombach*, 355 F.3d at 177-78.